We will hear argument this morning in Case 22-340, Pulsifer v. United States. Mr. Horebsky. Mr. Chief Justice, and may it please the Court, the natural reading of Section 3553-F1 is that and means and. It joins together enumerated criteria. To be safety valve eligible, a defendant must not have A, B, and C, all three. That's what ordinary grammar says, and the surrounding text confirms. Congress used and to join F1A-C, just as it used and to require a defendant to satisfy each of F1-5. This reading makes sense. The historic First Step Act made the safety valve available for many more nonviolent drug offenders. Taken together, A-C exclude violent recidivists with a history of committing serious crimes, while F2-F disqualify current violent offenders. The government needs and to mean or, or it needs the Court to insert the words does not have into the statute three times. But asking for a rewrite isn't statutory interpretation. The government's surplusage and policy arguments don't change that. There is no surplusage because the statute and the guidelines contemplate that not every sentence for a prior offense earns criminal history points. As for policy, the government focuses on whether someone with serious criminal history could still satisfy F1. But the safety valve isn't a get-out-of-jail-free card. Serious recidivists will likely have a career offender enhanced guidelines range at or above the mandatory minimum, and judges can and do exercise their discretion to impose appropriate sentences. If Congress wanted to disqualify defendants for having any of A, B, or C, all it had to do was say or. That would have unequivocally expressed a distributive meaning, just as Congress did elsewhere in 3553F. Letting the government get to or when Congress said and would encourage Congress to be sloppy with the most basic English words, leaving square corners far behind, and in the criminal context where fairness matters most. The court should hold Congress to what it wrote. I welcome the court's questions. From your argument, it appears you do not accept the argument that and could have a distributive reading and a joint reading. Not in this context, Justice Thomas. Not in the structure of a conjunctive negative proof like what we have here in this statute. In what context can it have a distributive meaning? So I think the government gives a number of examples where, again, not in a conjunctive negative proof context, you might hear and to be or. I think what's going on in a lot of those examples, it's almost like your brain is autocorrecting from and to or. The proper word actually would be or because, again, and ordinarily connects things together, but sometimes people use English in a less precise way. And, again, you might understand that to mean or. That doesn't mean that it's syntactically correct, and that's not the standard that Congress ought to be held to when it's writing a statute, let alone a criminal statute. Let me give you a hypothetical and tell me if you think it falls into that category. So you're going in for a medical test and you receive something from the hospital. And it says to receive this test, the patient should not. And then, you know, it has like a list of things that the patient shouldn't do. And it says the patient shouldn't eat any food, drink any liquids and smoke. So I'm going to assume, Mr. Dvoretsky, that you're not a smoker. Do you feel perfectly able to eat and drink as much as you want? No, and that is a situation where I would hear that and to be an or. But there are a couple of things about that. First of all, in your hypothetical, that's all the text that we have to work with, whereas in 3553-F. Well, let's keep it with my text because you have some arguments about other texts and the government has some arguments about superfluity and anomalies. So let's just keep it to the text itself. So if we're focused just on your hypothetical, I probably would hear that to be an or rather than an and. Obviously, because the context tells you that it's an or rather than an and. And the reason that it's different from an example like drink and drive, which is, you know, your example, is there's something that connects those two things so that we know that the harm comes from the relationship between the two. Whereas in this case, we know that the harm follows from any one of the things. So either way, you're using context to establish meaning, aren't you? Well, the other thing that we know from your hypothetical, if I'm going in for a medical test, my mindset going into the medical test, I'm not taking any chances with the instructions that the doctor gives me. If there's any ambiguity about whether and means or, I'm going to take a safer course because I want to make sure that my medical test goes properly. So there is the context of the person who is giving you that instruction that I think also would lead you to take the safer choice there, which is to treat the and as an or. Mr. Dworksy, can I ask you, you know, I hear you saying to Justice Kagan, you said this to Justice Thomas, that your brain corrects and or. And when Justice Thomas asked you about whether the distributive understanding of and is grammatically correct, you kind of seemed to say no because you keep going to this example where your brain changes and or. So I just wanted a clear answer from you on that. So do you think that the distributive understanding of and is grammatically correct? I think it can be grammatically correct in certain contexts, but not in this context. So what about the corpus linguistics brief that says in 38% of the time, I understand, and you rely heavily on the fact that over 50% of the time people understood it in its joint sense, but 38% of the time they understood it in its distributive sense. So they did, and the corpus linguistic scholars concluded that it was unnatural for and to have a distributive meaning in that sense. By contrast, they also concluded that 100% of people would understand or to be distributive when used in a negative proof. So if you said, as reading law does, Justice Scalia and Professor Garner, in order to qualify, you must not have A, B, or C. That would be unequivocally clear to express a distributive meaning, and it would be unnatural to use and even though some people might hear it that way and understand it to be distributive even in that kind of a negated conjunction. You've been wanting to have the chance to explain why the context here is different and point to your contextual clues in this statute that are different from some of the hypotheticals you've heard. I'd just like to hear those. Sure. So there are a few points that I would make. First of all, the presumption of consistent usage. Congress used and to connect F1 through F, just as it used and to connect F1A through C. And so in both instances, that needs to have a consistent joint meaning, particularly since 3553F is all one long sentence. By contrast, and this goes to the meaningful variation canon, Congress used or throughout the statute as a disjunctive term. Look, for example, at 3553F4. A defendant satisfies that provision if he was not an organizer, leader, manager, or supervisor and was not engaged in a continuing criminal enterprise. So Congress knows how to use or and and to mean different things, and that's what it did in 3553. In addition to that, the government's argument is that does not have from the beginning of 3553F1 gets distributed to A, B, and C. It comes before the dash. It comes before the M-dash. So there are a couple of reasons why the M-dash doesn't support that distribution, in addition to the obvious preliminary point that the statute doesn't say does not have A, does not have B, and does not have C. One, Congress itself didn't think that the M-dash distributed the language before it. If it did, then it would not have had to repeat in A, B, and C the phrase as determined under the sentencing guidelines. Congress could have instead said the defendant does not have as determined under the sentencing guidelines M-dash, A, B, C. Instead, Congress repeated that every time. So Congress didn't think the M-dash was distributed. So that's your own superfluidity argument on your end. Well, I actually don't think it's a superfluidity argument. For the government, it would be pointless to have that language repeated but for your interpretation. But for the fact that the M-dash doesn't distribute what comes before. Mr. Gavirepsky, let me make sure I understand your argument first. If it said the defendant isn't eligible for relief if he doesn't have A, doesn't have B, and does not have C, you agree that the government wins. Is that right? Yes, because that would be setting out three independent conditions. Right. So when we look at this statute, I mean, isn't what is most likely to have gone on here is that Congress made a completely ordinary drafting decision, which said does not have A, does not have B, and does not have C. Who writes like that? What we usually do is we try to make writing efficient and not repetitive. And so we take out terms that apply to everything and put it in a format where we don't have to keep repeating it. Put it in exactly this format. I mean, you know, we do this in our ordinary writing. Congress does it in writing statutes. We don't keep on repeating a verb when the verb applies to everything. So that's what Congress did here. It just took out the rather than say does not have three times, it took it out and put it in preparatory language followed by three things that you shouldn't have. Two points, Justice Kagan. One, yet Congress did repeat as determined under the sentencing guidelines three times, which it didn't have to under that approach. Second, though, if you look at 3553F, the opening paragraph, that also ends with an em dash. So if the em dash distributes what comes before to each of F1 through 5, I'm sorry, if the em dash in F1A distributes does not have to each of A, B, and C, then the em dash at the end of 3553F also ought to be understood to distribute what precedes that em dash to each of F1 through 5. If that's right, then a defendant who satisfies any one of those, F1, 2, 3, 4, or 5, would qualify for relief. So, for example, you... Does it have the distributive meaning there, too, as Judge Oldham said? In that dash after F, you know, if the court finds it sentencing after the government has been afforded an opportunity, etc., that could have a distributive meaning, and then it wouldn't be Calvin Ball, you know, as you've been saying. You could say it's distributive in both situations. So I think what gets distributed before the em dash, the government on page 38 of their brief explains the em dash rule that they're advocating for, the distributive rule that they're advocating for. They say that each item after the em dash must be a logical and grammatical continuation of the prefatory clause, that the two can be read together without regard to the rest of the provision, as if it were complete. And so what would actually get distributed goes all the way back to the court shall impose a sentence without regard to... I mean, I get... I think this is a very hard case. I think it's a very hard case. I don't mean to suggest that it's clear. All I'm saying is that there is a way to read it that would be perfectly consistent by treating that last clause as distributive. I think that would not allow the distribution to be a complete sentence in the same way that starting it earlier would. You agree that determining whether the and distributes depends on context as a general matter, correct? As a general matter, I do. But I think that the key context to look to is the surrounding text in the first instance. Okay. But you agree that context matters? Yes. Okay. And the government says that one of the problems contextually with your interpretation, it would mean that offenders with more serious violent records, violent offense records, would be eligible for the safety valve, while offenders with less serious violent offense records would not be eligible. And the government says that would defy common sense. In addition to the superfluity argument they make, that seems to me a serious contextual issue that you have to deal with. So how do you deal with that? So, Justice Kavanaugh, Congress didn't have a reason to be concerned about joining A, B, and C for a few reasons. One, it knew that defendants would still have to satisfy the rest of F2 through F, which focuses on whether the instant offense is a violent crime or not. And Congress could quite rationally have thought that was the focus. In addition to that, as I said in my introduction. Do you accept my premise, though, that your interpretation would mean offenders with more serious violent offense records would be eligible and with less serious violent offense records would not be eligible in certain circumstances? I was going to say, I don't accept that as a categorical proposition. In certain circumstances. You can find individual cases where that would be true, but as Chief Judge Pryor explained in the Garcon case, Congress legislates at a macro level, not at a micro level. That can lead to particular cases where results might be anomalous. The reason that it doesn't defy common sense, though, to use the phrase that I think you used in your question, Congress knew that first, a defendant would have to satisfy F2 through F, and second, the safety valve itself, all that means is that courts exercise discretion to impose proportionate sentences based on a variety of factors, including criminal history. F2 through F don't have anything to do with criminal history, though, per se. They don't, and Congress could quite rationally, given the history of mandatory minimums and what Congress was trying to achieve here, wanted to focus more on the nature of the instant defense than on criminal history. But even as to criminal history, district judges can and do take that into account. Don't they have to under the sentencing guidelines? I mean, the safety valve just removes the mandatory minimum, but don't the judges then have to look at the guidelines, and wouldn't you expect that a defendant who had a number of serious criminal violent priors, the guidelines would take account of that in terms of what the ultimate sentence was going to be? You would expect that. You might also expect that a serious violent recidivist would qualify for a career guidelines enhancement. Presumably, this provision was meant to make some amount of sense. Congress would not have just said, well, whatever, and we'll just repeat some nonsense because we know that district courts have discretion in the end. They meant this gatekeeping provision to be a serious gatekeeping provision with serious criteria that meant something. And the question is, why would Congress – I mean, I guess what you're saying is you don't have an explanation for why Congress would say it's okay if you have a gazillion three-point offenses so long as you don't have a two-point violent offense. Justice Kagan, we do have an explanation, which is that Congress, again, Counsel, I mean, why are you resisting the obvious conclusion that the Ninth Circuit came up with, which is if you have a three-point violent offense, you have a two-point violent offense, and therefore this anomaly dissipates completely. On that point, I think the better reading of the statute is that two points means two points and three points means three points. The sentencing guidelines distinguish in that way between two-point offenses and three-point offenses. So I don't know that you need – So you think the Ninth Circuit was wrong in a case that favors you. Alas, here we are, day one. I think the better reading of the statute – the better reading of the statute is that two and three are mutually exclusive, but – Okay, so you embrace the anomaly. Well, I think there are two points associated with this. One is the surplusage point, which we haven't talked about. The other is the anomaly. On the anomaly, I think there can be situations where that would happen. I don't think that makes Congress's statute here irrational. And indeed, isn't that what Judge Pryor said in the Garcon case? I mean, I took you to be sort of embracing his philosophy as to how the guidelines work relative to the mandatory minimums and that it is not irrational at all for Congress to be making the amendment that they were making in this case, which was intended to broaden the availability of the safety valve. That's right, Justice Jackson. It was intended to broaden the availability of the safety valve in recognition of the fact that mandatory minimums applying automatically, without regard for the offender's particular circumstances, are unfair and unjust. And so Congress wanted to move away from that. I'm sorry. No, no, please. No, please. You mentioned surplusage. Could we talk about that? If B and C made A 100% surplusage, what would you say? Even in that circumstance, as Judge Newsom, for example, said in Garcon, you would still have to adhere to the ordinary meaning of and in this situation, and the surplusage would not matter. But B and C don't make A surplusage, and I think that's for the reason that Chief Judge Pryor, who was a former acting chair of the Sentencing Commission, explained in Garcon. That is that not every sentence for a prior offense earns criminal history points. Okay, I understand that argument. Suppose I think that if it made it 100% surplusage, that would be a pretty strong argument against you. Let's just take that as an assumption. Would you draw a distinction between that situation where it's 100% surplusage and the situation where it's 99% surplusage or 98% surplusage? I don't know that I would, because either way, the surplusage canon isn't an absolute rule, and it doesn't justify, in this case, overriding the ordinary meaning of and. The other textual cues that we talked about and argued about in our brief, the Senate's drafting manual here is also a relevant consideration. The manual says that and indicates that something is included in a class only if it meets all of the criteria, whereas or says that something is included only if it meets one or more of the criteria. So the point is that Congress, by default, following that drafting manual, uses and in its joint sense. Didn't Congress actually contemplate the difference between and and or in this very context? And by that I mean, are you familiar with the enactment history? My understanding is that Congress looked at a bill in the previous cycle that would have done exactly, almost exactly what happened here with respect to increasing to four points, including B and C, and in that draft document, they used the word or. And yet here now, on the enactment of this, we have and. So that suggests to me, at least, that Congress was consciously determining that there was a difference between and and or. Sure, and I think there are a number of different indicators. We can go through the list that Congress understood the difference between and and or, and these are the words that it wrote. And the words that it wrote have to be given effect even in the face of surplusage. I don't think if we're going to go into the legislative history, though, when Senator Grassley introduced the bill that became law, the Judiciary Committee report on that said that it would exclude offenders with three point felony convictions or prior to point violent offenses. So if we're going to go down that road, I'm not saying we should, but if we're going to go down that road, I'm not sure that that fully helps you. So I think that particular legislative history that you're focused on, Justice Kavanaugh, is a little bit mysterious because the rest of it also says that offenders will not be eligible for the safety valve, quote, absent a judicial finding that those prior offenses substantially overstate the defendant's criminal history and danger of recidivism. So while the statement that you're referring to used or rather than and, the statement also suggests, and I'm not quite sure where Congress is getting this, that courts could exercise discretion to trigger the safety valve notwithstanding a defendant's criminal history. Counsel, I think it may have come from the legislation they had been looking at. That exact language that you just read came from the Sentencing Reform Act of 2015 that used the or between A, B, or C. But then it gave a discretion to the sentencing judge to ignore it. It actually supports your position that Congress knew that the or should be there, but only if the court could deviate. When it decided to take away the power to deviate, it raised up the qualifications by doing A, B, and C. Right, and all of that accords with the purpose of the First Step Act to move away from mandatory minimums towards considering the offender's individual circumstances in a particular case, which of course would include criminal history. District judges obviously apply the guidelines. As the Federal Defender's Brief shows, I think at pages seven to eight, district judges routinely depart upward where it's called for based on a defendant's criminal history. The career offender guidelines lead to sentences routinely of 25 years to life, and so the sentencing guidelines will account for the kind of individualized circumstances that Congress wanted. On that score, I just wanted to take this case as an example to test it in my own mind, and I went back and looked at the pre-sentence report and things like that. And as I understand it, 15-year minimum, 180 months. For some reason, your client got 162. I'm not sure why. Maybe you can tell me. So that would be the 15-year mandatory minimum. Safety valve gets him with his criminal history approximately, my law clerks tell me, between 120 and 150 months. He was over 60 years old when he was sentenced, so we're talking about whether he might be free when he's 70, 73, or 75. Is that what's really at stake here? That's right. This is a 60-year-old offender. He does have a criminal history. That criminal history would be taken into account under the sentencing guidelines, and nobody is talking about him not serving a serious prison term. He's going to be at least 70 years old when he's released. He'll be under parole, I assume, for a good bit thereafter, supervised release. And the judge, of course, could depart or bury upward if the judge wished to. That's right. If the court wanted to do that. Would you have a different rule for a 22-year-old offender? No, but the point, Justice Kavanaugh, is that Congress wanted individualized circumstances. Then why have the criminal history disqualification at all? At least my understanding of the statistics is, based on 2021, of 11,000 offenders who met the non-criminal history requirements pre-First Step Act, 6,000 would be disqualified. Under the government's interpretation, only 4,000 would be disqualified, so a substantial number, 2,000. But under yours, only 300 or so would be disqualified, which basically eliminates the criminal history disqualification in 98% of the cases. So why keep it at all, given, as you rightly say, the individualized discretion that sentencing judges use? Why have all this if it's really not going to make a difference, as Justice Gorsuch says in a lot of cases? If I could, two points, one conceptual, one on the facts. Conceptually, look, Congress could have thought that the combination of A, B, and C was a particularly egregious combination, and that at a macro level was what it was targeting. It could still serve some purpose. Congress didn't know when it passed that what the numbers would look like. Second, on a factual level, in response to those numbers, those numbers, the 2.8% or whatever it is, that's calculating things under the Ninth Circuit's Lopez interpretation. It's not calculating the numbers using the approach that we're advocating and the Chief Judge Pryor adopted in Garcon, which allows all defenses to be counted under B or C, even if they don't count towards the criminal history total in A. So we actually don't know what the numbers would look like when you apply the approach that we're advocating. Thank you, Counselor. Justice Thomas, anything further? Justice Alio? Well, just out of curiosity, I wonder if I can ask you a question about how you think language works in general. Let's just forget about special rules that apply to statutory interpretation for a moment and just talk about how language works in general and your understanding of that. If I say something and it's ambiguous and you're trying to figure out whether I mean A or B, to what degree do you take into account whether A or B makes more sense? I might take it into account, but the other thing I would take into account is my relationship with you as the speaker. So if Justice Kagan's hypothetical, if my doctor tells me don't do A, B, and C, my relationship with the doctor is I want the medical test to go well and I assume that my doctor is being very cautious and conservative because my doctor is. So that's the context. It's the relationship with the speaker that's letting me turn an and into an or there. In this situation... That's a fair answer. So you have to take into account some image of the speaker and your relationship to the speaker. So who is the speaker that we're talking about when we're trying to understand a statute that is enacted by Congress and what attributes do we attribute to that speaker? So I think that actually raises two different questions. Who is the speaker? So I think the speaker is Congress. Okay. And what is our image of the speaker? What characteristics does the speaker have? That feels like a loaded question. Why is it a loaded problem? I don't mean to be derogatory of Congress. I'm not looking for a derogatory answer or necessarily a complimentary one. But if that's how language works, don't we have to have some image of who's the speaker of this speech that we are interpreting? Well, the speaker in this case is an institution, but the institution is also speaking in the context of a criminal case and where we have basic words like and and or. I think you hold the institution, the maker of laws, to a higher standard of precision than I would hold my doctor, who I know has my best interests at heart and is trying to make me well. And so in that situation where Congress knows how to use and or or, and again, particularly in a criminal context where fairness is at stake, you hold Congress to the ordinary meaning of the word and, which is not a distributive meaning in this kind of a context. I think that the move to textualism in our interpretation of statutes was enormously beneficial and it eliminated a lot of abuses that previously occurred. But in the end, we are just interpreting language. Everybody, I assume in this courtroom today, speaks the English language. And all we're trying to do is understand some words in the English language. And it just seems to me that a lot of these arguments that we've heard, and the people here who haven't studied the case must think this is gibberish. It might as well be Greek with all this stuff about distributive and em dash and all of that. Is it necessarily that complicated? So I don't think it's complicated because I think that the natural way to express what Congress wanted to express here would have been or. Using and to express that any of the three would disqualify you is unnatural. And so I think that really is the key point, is that we're holding Congress to what the ordinary understanding of these terms is. Justice Sotomayor? I want to go back to that point. And as I understood you earlier, when Congress wanted to use a distributive form, it generally did it. It did it in F-2 by using the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon or. When it wanted to do a not in F-4, it wrote contrary to Justice Kagan's expectation in a very cumbersome way. It said the statute requires that defendant was not an organizer or leader and was not engaged. And it went on and on. So here the anomaly would be Congress changing course just for this one provision and changing and to mean or. I think that's your basic point. But assume that we have two ways of reading this statute, that you could accept that there was a possibility of reading or to mean and. Where does the rule of lenity come into this? If at the end of the day you conclude taking into account all of the various textual cues that are available here, that this statute is grievously ambiguous, that's the standard that the court has used, then at that point the rule of lenity calls for Mr. Paulsoffer to win, favoring the defendant. And if Congress wants to change and to or in a revision of this statute, that's a very easy change for them to make. But the burden of that ought to be on Congress, not on defendants whose liberty is at stake in the face of a seriously ambiguous statute. So where does supposage and common sense come into that? Meaning if all of the grammatical indicators suggest that an means an and or means or and the two are not the same, does that constitute a grievous enough ambiguity to say that lenity should play a part here? I think it does. I think that alone is enough to conclude that an means and, even if there were supposage, which I don't think there is. So assume there is not, because I think Justice Alito was saying, I don't know. Can you quantify that supposage here, the number of cases that would fall into your exception? Is it a lot? Is it little? I'm not sure. Meaning the number of cases where somebody would satisfy B and C but not A? Exactly. So I can't quantify it, but Chief Judge Pryor and Judge Wood and others in the lower courts have given a number of examples where that could happen. You could have somebody with old offenses that qualify under B or C, or tribal convictions, or something subject to the single sentence rule. And the guidelines in those situations, you could have points associated with those offenses that don't add to the criminal history total, which is what A is focused on. How many of those cases there will be, I don't know, but Congress could quite rationally have thought that B and C were serving a different purpose than A. Thank you. Justice Kagan? I want to go back to Justice Alito's line of questioning. And you said that the difference between my hypothetical on this case has to do with the relationship between the speaker and the person listening to the injunction or the prohibition or whatever you want to call it. That's one difference. Yeah, and I think that that might be one difference. But another difference, which is the one I suggested before, has to do with the relationship of the items on the list. And this is why Don't Drink and Drive is so powerful, because automatically we understand that the harm that's being sought to be averted is the combination of the two. Whereas other lists, you can see that the harms are much more independent, that things are independently disqualifying and were meant to be independently disqualifying. And that's why the three-point, two-point anomaly seems so significant to me. Because what that suggests is that these were meant, you know, when you take the intersection of those, it doesn't work under your reading and it does work under the government's reading. So I want you to respond to that view. I think the answer, when you say it doesn't work, Justice Kagan, I think what you mean by that is it's leading to an anomalous result in this particular case. Well, not just in this particular case. It leads to an anomalous result in the case of anybody who has lots of three-point offenses, both violent and nonviolent, let's say, but does not have, just happens not to have, a two-point violent offense. But it doesn't lead to anomalous results in a whole other class of cases where Congress might rationally... The two-point criterion and the two-point violent criterion were meant to operate independently, each one being disqualifying. That's one inference, but I don't think that's the only inference that you could draw from A, B, and C. Congress could have thought that A, B, and C combined were worse than any of them alone. Now, yes, that could lead to a situation where a seemingly more serious offender qualifies under F-1 as opposed to somebody who's a less serious offender. Congress didn't have a particular reason to be concerned about that because that offender would still have to satisfy F-2 through F-5. And even then, the sentencing guidelines would take into account that person's criminal history and the district judge would take into account that criminal history when determining the sentence. So Congress had no reason to think that as a result of that supposed anomaly, there would be unjust results in the real world.  I'm sorry. Justice Gorsuch? Let me see if I've got it right. Tell me where I go wrong, okay? The two arguments we've heard this morning on the other side so far are that there's a surplusage problem you have. But everybody seems to admit there's a 100% surplusage. It's something less than that. So it's not really a surplusage argument of the kind we normally adopt or take seriously. And the second is the 2.3 point violent offender anomaly, which is in the nature of or in the direction of an absurdity argument. But it never really gets there. And so everybody's dropped the label that it's an absurdity. They've tried to pursue that below, but nobody really argues that it takes it seriously here. It's a policy argument. It's a policy argument. And it's an imperfect one because one could abstract at a policy level. Okay, that's on one side. On the other side, and means and. Plain language. Everybody in the room does understand that concept. Number two, there is a distributive examples elsewhere in the statute. F2 is distributive, as Justice Sotomayor pointed out. So Congress knows how to distribute what it wants to distribute. And then three, lenity, which is the word that we dare not utter. But which Chief Justice Marshall back in Wilberger said applies before you get to things like legislative history and what Congress might have wanted and policy arguments. And the fact of the matter is, at the end of the day, what we're really talking about here is whether mandatory minimums send people away for life's life sentences effectively for many people. Or whether the guidelines, which are not exactly the most defendant-friendly form of sentencing known to man themselves, apply. That's what's at stake here. What am I missing? That summation was better than my introduction. I don't think you're missing anything, Justice Gorsuch. You agree, however, that context is relevant. You said that earlier. In determining whether the end distributes. I just want to make sure you still agree with that. You said that earlier. I agree with it, and I think that the key context is the surrounding statutory text. That's what you look to first. I don't think that policy considerations, as Justice Gorsuch was explaining in his question, are the relevant context to consider here. Context, I think, is a very broad term. Then I have a fact question and then one broader question raised by Justice Gorsuch's comment. On the fact question, how many individual uses or dosages does 141 grams of meth get you? I'm sure you acknowledge meth is a serious problem in many communities in the United States, and what's your sense of 141 grams? The government can talk about this as well. I honestly don't have a sense to give you the answer to that question. You could certainly imagine that being a relevant consideration taken into account at sentencing, but I can't quantify that for you. Then on the sentencing guidelines, those are not mandatory, correct? They're not mandatory. Right. So the reference to the sentencing guidelines, a lot of judges would sentence under the sentencing guidelines in certain cases, and that happens. I guess the broader point there is the reason there are mandatory minimums, there are problems with them, as you identify, but I want to give you a chance to respond to the counterpoint, which is that Congress uses them on some circumstances, because with the hundreds and hundreds of federal district judges around the country, they think that some judges might sentence certain serious offenders to too light a sentence, and so they wanted to prevent that from happening in certain kinds of cases. So the discretion doesn't seem like a total answer to the concern that Congress would have about cases like this. Of course, the government can and does appeal sentences when they think that the sentence ought to have been higher. You know and I know that almost never works, but what's your other argument then? I think that this goes back to the purpose of the First Step Act. This was a once-in-a-generation sentencing reform, passed in a bipartisan manner, signed by President Trump, where the motivating force here was to move away from mandatory minimums. Yes, Congress did not completely eliminate mandatory minimums from the U.S. Code. If it had, we wouldn't have this case. Congress chose this rather complicated First Step Act solution to the problem, but the problem it was trying to solve was moving away from numerous instances of unfair and unjust mandatory minimums and giving district courts the discretion, which by and large, overwhelmingly, they exercise properly, to take into account individual circumstances. Okay, thank you very much. Justice Barrett? Mr. Freschi, I wanted to give you a chance to respond to the government's argument that lenity doesn't apply to a safety vows statute. So lenity clearly applies to penalty-imposing provisions, like sentencing provisions. And so one could say, well, that principle would say that this statute is part of the sentence, and so it applies, and I assume that would be your answer. But I asked my law clerk if she could find any examples of situations like this. You just told Justice Kavanaugh the point of the First Step Act was to afford relief. And so it actually feels more to me like the argument would be a remedial statute should be construed broadly rather than lenity, which is like a harsh statute should be construed more narrowly. So can you give any examples of situations in which lenity has applied to a situation like this? So as you said, Justice Barrett, lenity has applied to sentencing cases. I'm not thinking of an example of a sentencing case where we're dealing with a safety valve kind of structure because as part of my colloquy with Justice Kavanaugh, I was saying this was a convoluted way for Congress to do this. But either way you want to look at it, whether it is lenity in favor of the defendant, the defendant having to satisfy all three in order to be disqualified, or if you want to look at it as Congress wanted to grant broad relief here for mandatory minimums, so therefore we ought to construe and to mean and and not limit the class of defendants who are eligible for that broad relief. I think either way it leads you to the same conclusion. And either way, Congress knows how to use and and or. It ought to be held to those ordinary meanings. And if it were to disagree with this court's decision in our favor, Congress is free to amend the statute. Okay. And then I have one other question that's related to the surplusage argument. Do the guidelines use that phrase? I mean, I don't want to go toe-to-toe with Chief Judd's prior on what the sentencing guidelines allow and not. But I'm having a hard time getting my mind around this because intuitively it does seem like the surplusage argument makes more sense. And it seems to me like the argument that you can have a three-point offense that doesn't earn criminal history points because it's too old seems like it's kind of bending over backwards to find a way to make it not superfluous. So, I mean, do the guidelines use that phrase, three-point offense? The guidelines don't use the phrase three-point offense, but I think you get there both from the statute and from the guidelines. The statute itself draws this distinction. In F1A, it talks about a four-point criminal history point total, but then it excludes a one-point offense. So the statute in A has this concept that you can have a one-point offense that actually doesn't count towards the criminal history total. That understanding of a one-point offense then carries through to B and C for a three-point offense and two-point offense. The guidelines are consistent with that in a couple of respects. One, as Chief Judge Pryor said, the guidelines do use the term offense, and they talk about sentences from offenses not counted. That is what 4A1.2 does. And so the guidelines are really setting up an order of operations. Under 4A1.1, you assign points to a sentence based on its length. Under 4A2, however, you then say that certain sentences and offenses don't count. And so the guidelines have that concept. Lastly, there is Note 3 to 4A2, which we highlight in our brief. That confirms that the guidelines contemplate that points can be associated with an offense without being counted. So for purposes of the single-sentence rule, that comment tells you that if an offense would have gotten two points, it can still serve as a predicate for the career offender guidelines. That idea of an offense that would have gotten two points if they had counted is this concept that Congress incorporates. So how many did Mr. Pulsifer have? How many three-point offenses? I'll just tell you, looking at the PSR, I think he had two three-point offenses that counted because they weren't stale, and then one that was too old. Is that correct? That's right. Okay. But then he argued below that he only had two three-point offenses. So he didn't make this argument that he had three three-point offenses. Right. He didn't need to argue this one way or another. What he needed to argue and did argue is that he didn't have a prior two-point violent offense. But I think he said initially that he had two three-point offenses. So you would say now, your position now is that he has three three-point offenses? For purposes of this statute, yes. Okay. Thank you. But not for purposes of A. Jackson? Yeah, so I'd like to go back to Justice Kagan's conception of this in terms of the focus on the anomaly. And I guess I don't see it as anomalous given the context of the point of the statute. And I think you sort of responded to Justice Kagan and Justice Kavanaugh in this way, but I guess maybe you can help me to understand. I thought this statute was about relieving the mandatory minimum and thereby giving judges discretion. So to the extent that the First Step Act wanted to do that, I don't think anybody disputes that, isn't it conceivable that Congress still just wanted to identify particular circumstances in which the mandatory minimum should apply on the basis of criminal history, and they could do that as narrowly as they wanted to, correct? Yes, that's right. I mean, right? Like, it doesn't seem to me to be anomalous that Congress picked out a particular circumstance as you described it in your introduction. A situation in which a person had all three of these circumstances would be one in which Congress still intended for the mandatory minimum to apply. But in other circumstances, even if they involve serious offenses, even if they involve Congress was willing to allow for judges to have discretion under those circumstances to take into account what the guidelines would have said or whatever. I don't understand why that's, like, a harm or anomalous or anything. I think that's right, and I think that's especially right when we're only talking about F-1 as playing the initial gatekeeping role. You still would have to satisfy F-2 through 5. Correct. And even then you get, I'm sorry. Yes, correct. So we already take care of really terrible people in this particular situation, and I would think that a situation in which you had a two-point offense in your background would be the kind of thing that Congress might home in on as making sure, because otherwise it could be kind of a borderline situation. So Congress would say, okay, we want to make clear that the mandatory minimum should still apply if a person has more than four, and they've had at least a three, three-point offense, however it's defined. I take Justice Barrett's point about that, but I do think the guidelines lead you to identify three-point offenses. But Congress could say, look, we're lifting the emphasis on criminal history. This has been a problem keeping people, the court, from considering raising, alleviating the mandatory minimum, so we're not going to have a focus on criminal history anymore. However, there could be a situation in which we want to make clear, because it's so borderline, we can't trust district judges to necessarily apply the mandatory minimum in this particular circumstance. So let us make clear that if the person has four criminal history points or more, if they have a three-point offense in their background, and if they have a two-point offense that is violent, you still have to apply the mandatory minimum in that situation. I don't see that as like crazy or making the statute not make sense. I think that's right. And while the government, in its argument, may disagree and prefer a different policy outcome, that really is, at that point, a policy debate. And the other thing I would add is if the government's view were correct, that any of A, B, or C were independently disqualifying, you could have people disqualified, as in the Lopez case, for example, for a 14-year-old offense for spray-painting a building. That would be a three-point offense. Which would seem to undermine Congress's purpose of allowing for district courts to not have to apply the mandatory minimum in some situations. Right. The government's argument is that under our interpretation, the First Step Act is doing too much. Under their interpretation, the First Step Act, I would argue, is doing too little. Either way, that's a policy debate. One that Congress could fix very clearly if we say it's and by just changing it to or, correct? That's right. Either way, that's a policy debate, and Congress could amend the statute, and it would be very easy for it to do so simply using and and or. Thank you. Thank you, Counsel. Mr. Liu? Thank you, Mr. Chief Justice, and may I please the Court. And is conjunctive in 3553F1. The question is, what does and conjoin? It joins together three independently disqualifying conditions by distributing the phrase does not have. That's the only interpretation that avoids rendering the first paragraph entirely redundant and the only interpretation that assigns F1 a coherent gatekeeping rule. What's inexplicable about petitioner's reading is that it would disqualify only those defendants with a rare combination of characteristics, including a prior violent offense of exactly two points. So a defendant convicted of a violent offense would actually prefer to receive a longer sentence worth three points to avoid being disqualified. That makes no sense. Petitioner's counterarguments fall into three buckets. First, he argued in his brief that the distributive interpretation is textually impermissible, but grammar usage and legal drafting guides say otherwise, and the law is filled with distributive uses of and. Petitioner this morning attempts to distinguish these as cases involving negative conditions, but that's just a distinction without a difference. Second, petitioner argues that the distributive use of and is less common, but according to leading grammar authorities, and is usually distributive, including when combined with a negative. And even if that weren't true, even if, for example, 40% of the ands in the world were distributive, the job of the interpreter would be to figure out whether, in context, this case falls within that 40% rather than to simply accept petitioner's reading. Third and finally, petitioner argues that Congress could have more clearly expressed the government's interpretation by using or. But Congress could have more clearly expressed petitioner's interpretation by, for example, using the phrase does not have at least one of the following. And if Congress had used or, you can bet that defendants would be accusing the government of reading or to mean and by requiring that defendants not have a, not have b, and not have c. In any event, this Court has held that the mere possibility of a clearer phrasing can't defeat a meaning that's clear in context, because and in context joins together three independently disqualifying conditions, the Eighth Circuit should be affirmed. I welcome the Court's question. Mr. Lu, would you tell us exactly when we are to use the distributive approach, a reading as opposed to the joint reading? Well, the answer is it depends. It depends on the context. Well, see, that's the problem. We're not getting direction or guidance as to when it depends. It's almost as though this is a substantive due process of the word and, that we just make it up as we go along. I think you have to give us more than that. At least petitioner says the natural, the more natural reading or almost the default reading is and is conjunctive in a joint sense. Yeah, well, if you look at the grammar books, they say the opposite. They say when and is used, even when combined with the negative, this is the Cambridge grammar of the English language, they say and is more often distributive. So I think that's a fair starting point. But then I think you do need to look at the context of the statute. And, and is a relationship word. It's a word that connects other words. So you can't just look up and in the dictionary in isolation to know what it connects. The only way to figure out what it connects is to actually read the other words around and in the statute. And here, we think we have two extremely strong contextual indicators that Congress here intended and to be distributive. One is our surplusage argument, and the other is the argument that if you adopt petitioner's reading, the provision doesn't make any sense. What about the use of and at the end of 3553F? I mean, if you're right, then is it the government's position that 1, 2, 3, 4, and 5 are also distributive? No, we think and is doing the same work in both places. In the main list of things, F1 through 5, what and is doing is creating an eligibility checklist. The court must find 1, must find 2, must find 3, must find 4, and must find 5. What it's doing is the exact same thing in the subsidiary checklist. The defendant must not have A, must not have B, and must not have C. In both places, it's requiring that all the criteria be satisfied. But only if you put in must not have three times. In other words, if you don't repeat must not have, then it seems to me that 1 is saying that the defendant does not have all of those three. That's true. Our whole case depends on whether you distribute the does not have or you don't. What I'm saying is if you apply the same... What do you say about the fact that we have within this 3553, and I'm looking at F4 now, a circumstance in which Congress has repeated? You know, the defendant was not an organizer and was not engaged in. So wouldn't we have expected for Congress to do that same sort of thing if it meant for these things to be distributed in one? Well, Congress did do the exact same thing in F1. The only difference is formatting. The only difference is formatting and style. What Congress did in F1 was say, look, A, B, and C are pretty long. I mean, this would be much longer than F4. And so to help the reader figure out what the independent conditions are, we're going to split it up. How do you explain the prior bill that actually used the word or and had these same criteria? I mean, we do have a change. It's not as though Congress always used and, and so we're trying to figure this out. I think the only change is the criteria that the author thought were being connected. No, there's a change in the language of the prior bill and this bill with respect to the use of and. And my guess is when they put in or, they thought that A, B, and C should be read in a package because when they're read as a single unit with brackets, then or makes sense. But at some point, I think whoever wrote this thought, actually I think the criteria is does not have A, does not have B, and does not have C. Well, I think they were different. The House had the or and the Senate always had the and, correct? Right. I mean, look, I don't think there should be anything. I don't know if that is, that's not a full answer, but it's relevant to trying to figure out what the difference was. I think it's relevant. And my, I guess I have two deeper fundamental points. First, I don't think we should be relying on this sort of legislative history at all. But second. But why is that? Can you, why? Why not? I mean, we're trying to understand what I thought Congress intended this to mean. And so it seems to me at least, at least relevant what they had previously drafted as they looked at these various issues. Yeah, I don't think so because in the context of this case, everyone agrees. I mean, we've been accused of this throughout the brief, that the same thing can be rephrased as an or. So the fact that it was rephrased as an or, I don't think moves the needle at all. Any time someone is speaking and uses a connector, they have in mind what's being connected. When they used or, I would say to Congress. Mr. Luke, could you point me to one statute? We spend a lot of time with common language. But I've been looking at your brief and all the statutes you cited where you say that an also meant or. But all of them were framed in the affirmative. As examples, executive means by USC Section 105. Executive agency means an executive department, a government corporation, and an independent establishment. Or sometimes examples are framed in the negative, such as 26 USC Section 170F16D, which provides that the term household items does not include food, paintings, antiques, and other objects of art, jewelry, and gems, and collection. But I can't find another statute except this one, where a list of criteria is framed in the negative, and we distribute that negative the way you have. Point me to one other statute. You can't do it in this one. I think the example your Honor just gave qualifies. The provision in the Internal Revenue Code says to qualify as a household item eligible for a deduction. That's a list of examples. I'm talking about criteria that disqualify you. I want an example like this one. I think the household items one is just like this one. I think 34 USC. We're going to fight on the starting point. Counsel? I was just going to say if you could discuss for a little while. Mr. Doresky talked about his doctor and Congress, and I think Justice Alito made the very important point that we have to focus on who we're talking to or who we're listening to. What do you think about that? I mean, does Congress really, when they're drafting these things, focus as much as we have been focusing today on the grammatical structure and differences, or should we take it in a more colloquial sense, or how should we? Mr. Chief Justice, I think the government wins whether you take a literal or hyper-literal or colloquial understanding of what Congress is saying. Okay, but as a general starting point, what should we do? I mean, obviously we said we treat the language as being used in a common manner, but... I think the most important thing to know about our relationship with Congress is that we presume Congress to be rational. We presume Congress to be an intelligent drafter of opinion, of statute. That's why we apply canons like consistent usage and meaningful variation. And that's why this Court has said that it's this Court's role to make sense rather than nonsense out of the corpus juris. Well, but you can't really say, go so far as to say that it would be irrational for Congress to write the statute the way your friend wants to write it. I do think the way Petitioner frames it, it is incoherent. It is inexplicable. It can't be explained. I mean, just think of this hypothetical that we provide in your brief. Two defendants commit the same three-point offense. Then one defendant goes on to commit a series of murders, all three-point violent offenses. The second defendant goes on to commit just one more offense, a mid-level robbery, a two-point violent offense. If there was any sense to this statute, if, as my friend said, this statute cares about recidivism and violence, then the first defendant would be the one that's disqualified. But under his reading, only the second is. That's a good policy argument, but you don't argue that it rises to the level of absurdity that would trigger our absurd doctrines, our absurdity canon. We do think it would be absurd. You haven't made that argument. Well, we don't think we need to, because absurdity kicks in only when a court needs to disregard the literal text of a statute. So you don't invoke that canon, and one could imagine a rational Congress coming to this conclusion. It's not the conclusion you think most rational, but a whole bunch of lower court judges have found it rational. And then you have a superfluidity argument that isn't entirely leak-proof, right? It's a partial superfluidity. No, it's 100%. It's 100%. 100%. The entire subparagraph A is superfluid. So Judge Pryor is wrong as well, that one could read the statute rationally to every offense has a point, but that not all of them are counted under A-1-2. That's right. I mean, his view of the guidelines can't be squared with the text of the guidelines or the text of the statute. Can you explain that a little bit more, please? Oh, I'm sorry. Before that, I had one last question, if it's all right, which is when we're trying to figure out the most natural reading of the statute, whatever standard we've talked about, what should we account for the fact that the government didn't make this argument until this court in this case, that below in the Eighth Circuit it argued that and means or? You started this argument by saying we agree and is conjunctive, but in the Eighth Circuit the argument was it's disjunctive. No, I think we made it. Is that way in our consideration? We made the two arguments in the alternative. We made the distributive argument in our response brief in the Eighth Circuit, and that's why the Eighth Circuit accepted it. We used the word distributive in our brief. Counsel, I'd like to get back to whether or not this comports with the guidelines. Guidelines 101 is order of operation, and for a 1.1, one of the things I noticed in the government's brief was the insistence on inverting for a 1.1 and 1.2, which is actually not the way in which the guidelines operate. You start with 1.1, which allows us to determine which prior sentences are eligible for points. You get three points for a certain set of characteristics. That is, the sentence is over one year and a month. You get two points, et cetera. Once you have identified those, then you go on to for 1.2 and determine which count, which of those count for the purpose of the criminal history. Given that, and I think that's incontrovertible, how is it that Judge Pryor's view of the way in which this works is inconsistent with the guidelines? With respect, Justice Jackson, I don't think it's incontrovertible. I don't think the probation office or any government attorney has ever applied these two guidelines in that fashion. I'm sorry, what's not incontrovertible? You don't go in order of operation? Correct. When someone is applying 4A1.1, they're applying 4A1.2 to determine which offenses should be- Ultimately, but second, after they do 4A1.1, in order of operation. I respectfully disagree, Justice Jackson. I think the clearest evidence of this is on 4A of our statutory appendix, where you have the application notes to 4A1.1, and all of the application notes for when you add three points or add two points or add one point, incorporate 4A1.2. Now, if it were true that you look at 4A1.1, you push it away, and then you subtract those points, it wouldn't make sense to build into the commentary for when you add them all of the rules in 4A1.2. In other words, what this commentary is saying is before you add points, see if you're supposed to be counting that offense in the first place. Do you lose on that point? In other words, if the court decides that there is an order of operation, that you can identify offenses based on the points that are attributed to them under 4A1.1, and then you determine whether or not they're counted under 4A1.2, does the government's surplusage, whatever the argument is, do you lose on that point? If the court concludes that there is such a thing as a two-point offense that doesn't add points to the defendant's total, then yes, we do not have a surplusage argument. I understand your argument about the foreign sentences and the old sentences. It makes sense to me that you don't add up the points if you're not going to count them anyway. Indeed, trying to figure out what the points are for some foreign conviction strikes me as something that courts don't do and we shouldn't ask them to do. I'm not sure I understand your argument on the single-sentence rule. I'm not sure I understand Judge Pryor's view of the single-sentence rule either. I start with not understanding his view and I end with not understanding your response. I'm just wondering whether you can go over why you think the single-sentence rule does not operate against you, putting aside the old conviction and the foreign conviction rule. The single-sentence rule, in principle, is the same as the foreign conviction and military conviction rule in that it tells you what is your baseline for being the basis for adding points. What the single-sentence rule says is that when you have two sentences that are, say, charged in the same indictment and the defendant is sentenced on the same day, treat that, count that, as literal words, count that as a single sentence. Then that's the basis on which you move to the instruction in 4A1.1, which says how many points to add. When you combine those two, maybe you get a sentence that's three years instead of just one year. So then you know when you get to 4A1.1, we're going to add three points to that instead of just the regular old one or two. So that's how the single-sentence rule operates. But the principle is the same, which is that you don't get to the point of adding points until you figure out what your count is. Now, when Judge Pryor says this is contradicted by the language of 1A, why do you think that that's wrong? I think it's wrong because 1A has all over it the word add. And so there's no context in which, as I think Chief Judge Pryor was supposing, that points are assigned without adding them. No, I think she's talking about 3553F1A. Oh, F1A. Yes, F1A. Right. There's an exclusion in the text of F1A that says we're going to exclude points resulting from one-point offenses. I don't see how that helps my friend because the negative implication of that is that all the two-point and three-point offenses are being included in the total points. And so that just reinforces that when you have a two-point violent offense and a three-point offense, that's not being excluded from the total. It's being included. No, but the fact that you could include or exclude is the problem. In other words, Judge Pryor's point is Congress understood that there would be offenses that are called one-point offenses or called two- or three-point offenses that would not be included. And that undermines your point because your surplus argument relies on the view that every three-point offense is only such because it is counted. So to the extent that you can have a world in which something is a one-point offense but it is not counted, Judge Pryor at least says, that I think that, sorry, he says that that means that you're wrong about surplus. I don't think this helps my friend's argument at all. In fact, I think it cuts against it. If you read the exclusion, it says points resulting from one-point offenses. So the only offenses it has in mind are offenses that would actually result in points. The problem with Chief Judge Pryor's vision is that there are some offenses out there that would have resulted in points but for the fact that they're not counted. The text of 3553 F1A doesn't contemplate that. The only one-point offenses it contemplates are one-point offenses that actually- But what is the government's position on that? Do you disagree that there's a world in which you have an offense that would be assigned points but those points aren't counted for the purpose of the criminal history score? I mean, would be. I mean, sure, you can say would be, but- So then why aren't those the three-point offenses that this statute is talking about? Because in referring to three-point and two-point offenses, the statute's referring to offenses that actually give rise to two-point and three-points. Just like in the exclusion in 1A, it's referring to one-point offenses that actually result in points that count for the total. Can I ask you a question to follow up on Justice Thomas' original question? Because I think that's really important. So my understanding is there's an established rule of language and grammar that and distributes in circumstances where the context establishes that that's the better reading. Correct. But is there a more precise phrasing you can put on that? The context shows what? Sure, and I think Justice Kagan provided a helpful heuristic. We read things like don't drink and drive because there is something special about the combination of drinking and driving. It is particularly harmful, and so we're telling people don't do the two in combination. The problem here is that there is nothing special about the combination of A, B, and C except for its arbitrariness. The premise to your point, I think, and this is important and Justice Thomas raised it, is the and distributes sometimes. That's an established rule, so we just have to figure out when it is. And then on context, I think Justice Gorsuch has raised important questions about policy. So do you want to distinguish the context that we should look at from policy arguments, or how do you respond to the concern that those are just policy arguments and not relevant to the context, particularly the anomaly issue and also the number of offenders who would be disqualified now? I want to make clear that our second contextual argument is completely consistent with textualism. It's consistent in three ways. First, we're not arguing that purpose should trump text. We are trying to figure out, as between two textually grammatically possible readings, which one is the best one in light of context. Second, we are not deriving purpose from the subjective views of the legislature. We are deriving purpose from what a reasonably objective user of words would glean from the text and structure of this statute. And third, we are not defining this purpose at a high level of abstraction, like the broader the safety valve or the narrower the better. This isn't about broader or narrower. It's about a line, any line, that makes sense. That, in a textualist world, that would be an absurdly argument. I know. Let me just finish the question. You're going to have all the time to respond. Absurdity, we recognize. That's a very high bar. And you haven't invoked that canon directly. Maybe you want to here at the podium. Good luck with that. But that's a very high bar. You're saying, hey, Congress wouldn't have done this because it wouldn't capture some bad people. That seems to me, at heart, one of two things. Either an argument about intent. Congress couldn't have intended this. Wouldn't have intended this because it wouldn't want bad people to get away. Or two, it's a policy argument. You shouldn't want this to happen. And either of those seem to me straining at least your claim that this is all consistent with textualism, especially since you haven't identified a canon other than absurdity that would be kind of a classic textualist argument. Well, with respect, Justice Gorsuch, I think we're relying on a traditional tool of construction that this court relies on all the time. Which is what? It's called common sense in your brief. I don't know about canon, but I guess it's a good one. It's called construing the structure and the text of the statute, gleaning the evident purpose. Purpose. So it is purposivist. At some level, yeah. I thought the point was there's an established, I don't know if you want to call it canon, rule of English grammar about how to read and. That's correct. So if we accept that there's an established rule of English grammar about how to read and, and you don't always read it literally because that's not how people speak, then you don't need to get to absurdity because you're trying to figure out whether the and distributes or not. And then in figuring that out, the established rule is you look at context, right? Exactly. What context? I think what Justice Gorsuch is zeroing in on is that sounds like absurdity when you're bringing context, but maybe it being absurd is helpful or close to absurd is helpful in thinking about context. Well, I think this is the way the court has approached other cases. Take last term's decision in Jones v. Hendricks. The court there was construing 2255 saving clause. And one of the indicators of context that it relied on was the fact that the defendant's reading would mean that non-constitutional claims, i.e. statutory claims, will be given a superior remedy than constitutional claims. The court rejected that because it called that result strange and bizarre. In Abbott v. United States, which we discussed in our brief, this court addressed the applicability of 924C's mandatory consecutive sentence regime. Under defendant's reading in that case, the most culpable drug offenders would be excused from the mandatory minimum of 924C, while the less culpable ones would still be subject to it. I just want to make sure you're not conceding that absurdity applies because absurdity applies when the actual plain meaning of the text would lead to an absurd result, and we're at the antecedent point of asking what the text means, relying on these kinds of things. But what do you do about the corpus linguistics brief? I think that corpus linguistics brief helps us. It helps us in three different ways. Number one, the survey data and its analysis of the statutes in that case just shows that this distributive reading is textually permissible. But less likely. Less likely, according to them. But I think the job of a faithful interpreter is to figure out, you know, if it's an 80 to 20 percent split or a 70 to 30, 60, 40, the faithful interpreter needs to figure out are we in the 20 percent, are we in the 30 percent, are we in the 40 percent, or are we in the other box? It would be to tolerate a huge error rate if the court simply assumed that because 70 percent of ands out there are joint, we're just going to read every and in the world as joint. That would be a 30 percent error rate. This is the drafting manual of the Senate's legislative drafting manual. And it says, in a statement in the negative, or is almost always the correct word. And I think that's what the linguistic brief is telling us. You're putting it at 20, 30, or 20. But if your alternative reading is almost always incorrect, taking the negative of what the Senate manual is saying, don't I need something like absurdity? I don't think so. Don't you need it? I mean, I just don't know how you get to your point unless you get to absurdity. Then it's a policy argument. The Senate manual also says use and when you want to make clear that something needs to satisfy all the criteria. And that's, in our view, how Congress used and here. The three criteria are does not have a, does not have b. I think you just hurt yourself. You use and when you want it to meet all criteria. I think that's joint, all three. And in our view, the petitioner doesn't have all three because he doesn't have c. He has two out of the three. So he does not have, he doesn't have all three. Before we go too far on this, the alternatives are not that the worst criminals are going to get safety valve. Because if someone has all three of this, one could view the Senate as saying this is what disqualifies you. That would be the worst in the eyes of the Senate. You have to have a, b, and c. Right. And so what you're saying is I happen to think that someone that doesn't have a, b, and c, but has more b is worse, but that's your policy judgment, isn't it? No, to be clear, our policy judgment, our contextual argument isn't just the mere policy concern. It is a fundamental statutory construction problem to presume that Congress wrote a statute that doesn't make any sense. And we, Justice Barrett, I thank you for the clarification. We are not saying that we need to resort to absurdity because our main point is and is inherently contextual. It has to be contextual because it is a word that connects other words together. So the only way to figure out what it's connecting is to read those other words in context. But to get back to Justice Barrett's question about the, or I won't. I was just going to finish my answer to her question about the corpus linguistics brief. And I think the other two points just to round up my answer are that I think that brief itself acknowledges that context matters. On page 7 it gives an example of the phrase, don't take drugs and alcohol, and the meaning of that changes depending on which context you're saying it. And the fact that they can't rule out a distributive reading for 124 of the 125 statutes they studied also indicates that context matters. And the last point I'll make on the corpus linguistics brief is that the brief then stops short of actually looking at context. This is also on pages 6 and 7. They say that's beyond the preview of this brief. Justice Thomas, anything further? Justice Alito? This case to me raises a lot of general questions that may not dictate a decision one way or the other. But on this last point about the corpus linguistics brief, I think this is a very promising tool, but I don't know that we have decided how it can legitimately play a role in our statutory interpretation cases. I mean, this is an empirical fact that is being introduced into the case in an amicus brief. What guidance would you give us about the propriety of our relying on that? Yeah, I think the court needs to proceed with caution when presented with evidence like this, just like it's presented with evidence of any other sort of scientific study. I think in the context of statutory interpretation, we are trying to figure out what a reasonably objective user of words would understand a text to mean. And often we think of ourselves as occupying that role, and so empirical studies aren't necessarily helpful because we can just introspectively think about what that reasonably objective user of words would mean. Well, I have no reason to think this was not a study done in accordance with the highest criteria, but it is an interesting question what we're going to do with this down the road. Are we going to have to make a determination about the methodology that was used in every particular study of this kind that is presented to us in an amicus brief? I think that's a valid question and why I would suggest the court view it with caution. I think, though, in this particular case, even if the court does look at it, I think it helps the government's view because it only confirms what the grammar, usage, and legal drafting books already say. So it's simply reinforcing what other sources are saying about the meaning of these words. On another point, do you think the absurdity canon is about anything other than intent? I think it is partly based on this assumption that Congress is a rational and intelligent drafter of statutes, and so when we see a result that is absurd, we presume that that is not one Congress meant to embrace. It's an intent that's attributed to Congress. We assume that they do not intend to write something that's absurd. Correct. So it is about intent. Correct. It is about intent, and it's intent against the backdrop of a body, Congress, that we presume objectively to be reasonable. And if that is the case, why would we draw a bright line between absolute absurdity and mere absurdity? I don't think this court draws such a line. I think when, as here, there are two textually or grammatically possible readings, the court quite often tries to make sense rather than nonsense of the corpus juris, and that is a perfectly legitimate way, as Scalia and Garner say, of resolving this sort of statutory problem. Is this so to be or? Justice Kagan? Mr. Liu, I take your point that there are two grammatically permissible ways of understanding this, and I certainly think that your superfluity and your anomaly arguments are extremely serious. At the same time, I think Mr. Dvoretsky has a point of his own, which is that notwithstanding that there are two grammatically permissible ways of understanding this, that the most natural way of communicating this idea is to use the word or. I would say it's sort of the most natural way and also the way that prevents any confusion. You know we wouldn't be sitting here if Congress had used the word or. So in a context in which a defendant's liberty is on the line, where I'm just going to assume that the rule of lenity applies, notwithstanding your argument, why isn't that enough to get to Mr. Dvoretsky's position? I think because it's at most just one more. The fact that or might have been a clearer way to express this, I think at most that's just one more contextual consideration that you put into the balance. And if you care about the quote-unquote unusualness of using and instead of or, well then I think what's even more unusual are the problems with petitioner's reading. What's even more unusual than distributive use of and is the fact that the very first subparagraph is surplusage and the fact that this provision isn't going to be a coherent measure of a defendant's criminal history. So to the extent we are kind of weighing unusualness against unusualness, I think there's maybe just a little bit of unusualness here. I'm not really even willing to concede that given what the books say, but let's say you think there's a little bit of unusualness in using and. It's far outweighed by the unusualness of just striking out an entire subparagraph and rendering the rest incoherent. Thank you. Justice Gorsuch. Usualness question. The government may have alluded to this conjunctive distribution theory in its Eighth Circuit brief, but really it argued that it was disjunctive and that and can mean or. That was the thrust of its brief. Got it in front of me. That's certainly how the Eighth Circuit understood the government's argument below. They said that the parties discuss whether and should be read conjunctively or disjunctively, but we do not believe that is the important question. The government also argued the and versus or theory in Lopez in front of the Ninth Circuit. That's in its brief there too. And I understand that this is a refined position and with the benefit of the solicitor general's office. And that's great. And the government's entitled to make whatever arguments it wants. But when we're looking for plain meaning, what ordinary people would understand words to mean, isn't that some evidence that the government itself took this long to really figure out this particular theory? I think it actually kind of proves the opposite. I mean, the government looked at this from the beginning, and the idea that A, B, and C are independently disqualifying was clear as day. On the basis of a completely different theory that and means or, which you, in your first sentence, as you got up, you said it's conjunctive before us. And most of the argument below, I'm not going to say all of it, most of it below was disjunctive. And that's a difference. It's a difference. And the government of the United States has a lot of resources. And the average criminal defendant doesn't. They're one-off players. You're a repeat player. And you've got a very sophisticated, reticulated third theory of the possible meaning of the word and. Right? We're now up to three. And the fact that it took so long to get to the third, what do we do with that? I acknowledge that there were different theories, one relying on and, one relying on or, that were advanced in the lower courts. I think that just reflects what is a well-accepted principle that any phrase, a negative statement involving and, can be rephrased as a negative statement involving or. And so, as we often do in this court and in lower courts, we provide alternative arguments. One way is to read the and as distributive. The other way, if you want to go that route, is to read the and to mean an or. But the bottom line of both interpretations were, as the Bargains Theorem shows, logically equivalent. You reject the or theory as incorrect at this stage. You've not pursued it at any rate. Correct. There's no need to read this and to mean an or, because the distributive use of and is the more common use. We've got this new theory. All right. Thank you. Justice Kavanaugh? Justice Barrett? I'd just like to follow up on that so that I understand the lay of the land. I thought the government did, in some of the courts below, make the distributive theory, because it's what Judge Kirsch relied on in the Seventh. It's what Judge Kesslidge relied on. In all those circuits, we did. Correct. It's just that you didn't make it uniformly across the circuits. We did not make it at the panel stage in the Ninth Circuit. But we have made it in the panel briefs in the other cases, maybe with the exception of Garcon at the panel stage. But in this case, we made both arguments in our brief below. In the Ninth Circuit en banc, we made both arguments. And in the Seventh, Eighth, and Sixth Circuit cases, we made the distributive argument as well. Justice Jackson? So I appreciate that and can sometimes mean or. But this is not a conversation. This is a statute, and it's a criminal statute with huge implications for the lives and well-being of the people who come through the system. And so I guess what I'm trying to understand is why the imprecision in this statute, the fact that you say that there are two textually grammatically possible readings, why doesn't that count against the government? Justice Kagan said, I'm going to assume lenity applies. Can you help me understand why it wouldn't? It wouldn't for two reasons. I'll just say the first one briefly, but I'll skip over it after saying it. We don't think this is the type of penal law to which lenity applies. Now, if you think this is. Wait, why? Why? That's the thing I don't understand. It's because the definition of penal law that this court has embraced, and it goes all the way back to Blackstone, encompasses laws that define a crime or that increase or impose a punishment. And this provision here does neither. It relieves defendants of punishment. It is a congressional act of lenity. And this court has never applied the rule of lenity. So you reject, even though it has to do with punishment and the implications of it vary dramatically depending the level of punishment that a defendant can get varies dramatically depending upon whether or not it applies. You say lenity is not a relevant or a thing that we should consider. Correct. This court has never applied the rule of lenity to this type of statute. It would be an extension of the rule of lenity to a new context. I would analogize this sort of provision to, say, a statute that sets forth an affirmative defense. An affirmative defense to the substantive prohibition of a crime. But in a civil situation or in a criminal situation? In a criminal situation. In a criminal situation, an affirmative defense, you say no lenity. No lenity, because that's not a penal statute. Right, but that doesn't necessarily have to do with punishment. I'm talking about we've determined this person is guilty. He's getting a punishment, and this statute relates to the range of applicable penalties that apply to him. The government's position is still not a penal statute for the purpose of lenity, if there is ambiguity as to whether or not it applies. Correct. And that's because the reading of this statute can only benefit the defendant. It's not the type of statute that could make the defendant... Yeah, but if you don't get it, you don't get the benefit. I mean, there's a difference, right, in terms of your penalty, presumably, if you get it versus you don't. Right. So it can harm the defendant if you don't get it. It's certainly true that the defendant prefers one reading over the other. But the type of...what the rule of lenity cares about is the type of provision we're talking about and whether it fits the category of being penal. And a penal sentencing provision is one that imposes the punishment or increases it. This one doesn't do either. It can only go down. Now, the reason why we apply lenity in the first context is because we want to be sure before a defendant is made worse off that that's what Congress intended and the defendant had fair notice. But when the only direction the sentence can go is down, those purposes... The defendant who doesn't get it is not made worse off. If everybody else, their sentences can go down, but his can't. You're saying he's not made worse off. Not from the perspective of this type of provision. Congress's enactment of this type of provision did not make defendants worse off. Thank you. Thank you, Counsel. Mr. Dabrowski, rebuttal. Mr. Chief Justice, I'd like to start out with your question about whether Congress focuses on grammar. I think we have to assume that Congress focuses on grammar. Congress, as a speaker, does not get the benefit of colloquialisms. There's no conversation that people are having with Congress in the way that you do with a doctor or somebody else. The only conversation, if you want to use that analogy, is the conversation that this Court has with Congress by interpreting its words to mean what they say. And if Congress disagrees, it can carry on its part of the conversation by changing the statute. Otherwise, what we end up in is a guessing game about whether Congress might have meant this policy or that policy. Instead, the Court should give Congress clear rules of the road. And, in fact, the Court should instruct Congress to follow its own rules of the road, namely the Senate drafting manual, which, in this case, would have called for the use of the word or if Congress meant a distributive meeting. With respect to Mr. Liu's point that and is distributive in grammar books, the government has not come up with any examples of and in a negated conjunction in the U.S. Code. Reading law tells us that when you have the formulation that someone must not have A, B, and C, that means all three. The Corpus Linguistics study supports that conclusion, that if you had or there, it would be perfectly clear, and using and there to express a distributive meaning is unnatural. The government's best example of a statute is the household items provision in the tax code. First of all, as Justice Sotomayor pointed out, that says does not include, so it's setting forth a list of examples rather than criteria. Second, just looking at what it's talking about, food, paintings, antiques, other objects of arts, jewelry, and gems, there is simply no way to combine those things, right? There's no such thing as edible antique jewelry. It's beyond absurd to think that there would be. Here, it is not absurd to say that Congress could have required A, B, and C in combination. The government has policy arguments for why Congress might not have wanted that, but it's not absurd to think that it did. With respect to the policy, if you had an individual defendant who had, let's say, two previous violent offenses in addition to the current drug offense, that would make that defendant a career offender. And if you walk through the guidelines, you end up with a guidelines range for an offense level of 34 for someone like that and a criminal history category of 6, which is 262 to 327 months. That is a serious long sentence. In addition, if you look at the Sentencing Commission's 2022 data, there were approximately 20,000 drug offenders. About 1,000 of them, so around 5%, were career offenders. Taking those two points together, what that tells us is that you will have long sentences for the rare recidivist that we spent a lot of time talking today as somebody who might somehow satisfy F1. It's entirely sensible that that is not what Congress was focused on when it was seeking to broaden discretionary sentencing and move away from mandatory minimums. Lastly, with respect to common sense, the government focuses a lot on common sense, but it's common sense that if Congress wanted to say or, it would have said or. It knew how to do that in other parts of this very sentence of 3553F. Congress's own drafting manual says to do so, and that would be the ordinary term to use in order to express the meaning that the government attributes to this statute. The court should, again, hold the court to the ordinary meaning of the terms that it chose, and it's important to do that because, again, this is a criminal statute where fairness is at stake, whether you view that as lenity or whether you view that as the breadth of a remedial statute. There's fairness at stake and there's somebody's liberty at stake, and if Congress wants to use, Congress needs to use terms clearly in order to get the benefit of the government's interpretation here. Thank you, counsel. The case is submitted.